BATCHELDER, C.J., delivered the opinion of the court in which NORRIS, J., joined, and STRANCH, J., joined in Sections I. and II.A. STRANCH, J. (pp. 678-81), delivered a separate opinion concurring in part and dissenting in part.
OPINION
ALICE M. BATCHELDER, Chief Judge.
At its core, an insurance policy is simply a contract between the insurer and the insured, with each entitled to the benefit of the bargain. This statement encapsulates two self-evident but fundamental tenets of contract law — that generally speaking: (1) the benefit of the bargain directly accrues only to the parties to the contract, unless the contract otherwise provides; and (2) the parties are entitled only to the benefit of their bargain, that is, the bargain represented in the written contract. These two tenets decide this appeal.
Here, the insured is Plaintiff-Appellant Tooling, Manufacturing & Technologies Association (TMTA) and the insurer is Defendant-Appellee Hartford Fire Insurance Company. The insurance policy at issue, known as the CrimeShield Policy (Policy), is a type of employee fidelity policy designed to transfer the risk of employee theft from the TMTA to Hartford. The TMTA’s decision to insure against employee theft was prescient — almost immediately after the parties signed the Policy a TMTA employee began diverting funds into his own accounts that would have otherwise, in the fullness of time, accrued to the TMTA.
The problem for us is that the pilfering employee, one Mark Tyler, diverted funds not from the TMTA but from the TMTA Insurance Agency (Agency) — a limited liability corporation controlled by the TMTA and from which the TMTA receives a significant portion of its income. And the Agency is not a named insured under the Policy. Hartford refuses to pay the policy because of its view that the Agency, not the TMTA, suffered the loss and the Agency is not a named insured. The TMTA appeals to us to enforce its interpretation of the Policy, arguing that the Agency is covered because the TMTA is covered, and that any loss to the Agency is actually a direct loss to the TMTA — direct losses being covered under the Policy’s express terms.
So is Hartford’s refusal to pay the TMTA’s claim on the Policy a breach of contract? The issues are twofold: (1) may we consider the Agency a party directly covered by the policy, and (2) regardless of the resolution to the first issue, does the Policy otherwise provide for the TMTA to recover funds that were diverted from the Agency? Because the answer to both questions is “no,” there is no breach, and we affirm the judgment of the district court.
*668 I.
The TMTA is a Michigan trade association whose members are engaged primarily in the manufacturing and tooling industry. The TMTA arranges the sale of insurance policies to its members as part of its normal activities, but because Michigan law does not permit the TMTA to collect commissions directly from insurance companies,[1] the TMTA created the Agency as a licensed producer to facilitate receipt of the commissions. The district court noted:
[The Agency] is a Michigan limited liability company that brokers insurance policies for TMTA members. TMTA is the Agency’s sole member and TMTA’s entire revenue derives primarily from the Agency in the form of commissions from insurance companies paid directly to the Agency for brokering policies to TMTA members. The Agency has no employees and its property consists only of the commissions paid to it by insurance companies for sales of policies to TMTA members. TMTA accounts for all of the Agency’s income as part of its federal and state filings. Thus, each year, TMTA receives the entire benefit or loss from the Agency’s operations.
Tooling, Mfg. & Techs. Ass’n v. Hartford Fire Ins. Co. (Tooling I), No. 08-cv-11812, 2010 WL 3464329, at *2 (E.D.Mich. Aug. 30, 2010). The TMTA hired Tyler to be the Agency’s general manager “for the purpose of brokering life, health, disability, and accident insurance for TMTA members,” but Tyler was paid and employed by the TMTA, not the Agency. Id.
In September 2003, the TMTA— then known as the Michigan Tooling Association — procured the Policy from Hartford. The Policy covered employee theft (up to $300,000), depositor’s forgery, non-employee theft, disappearance and destruction, and computer and funds-transfer fraud. In addition to the TMTA, the Policy and its amendments listed six other named insureds[2] — but not the Agency— and the Policy provided that “[a]n ‘employee’ of any Insured is considered to be an ‘employee’ of every Insured.” The employee theft provision of the Policy provided that: “We will pay for loss of or damage to ‘money’, ‘securities’ and ‘other property’ which results directly from ‘theft’ by an ‘employee’, whether or not identifiable, while acting alone or in collusion with other persons.” The parties now debate the meaning of the word “directly,”[3] but do not dispute that Tyler met the definition of employee under the Policy or that there was a theft.[4]
*669 The Policy also contained a number of exclusions to coverage, including:
Loss that is an indirect result of any act or “occurrence” covered by this Policy including but not limited to loss resulting from
1. your inability to realize income that you would have realized had there been no loss of or damage to “money”, “securities” or “other property”.
2. payment or damages of any type for which you are legally liable. But we will pay compensatory damages arising directly from a loss covered under this policy.
3. payment of costs, fees or other expenses you incur in establishing either the existence of or the amount of loss under this policy.
The parties also dispute the applicability of this provision to the facts of the case. Finally, the Policy defines “theft” as “the unlawful taking of ‘money’, ‘securities’ or ‘other property’ to the deprivation of the insured,” and further that “this Policy is for your [the named insured’s] benefit alone and no other person has any rights or benefits.”
In early 2007, Tyler resigned from his position at the TMTA. Soon thereafter, the TMTA discovered that, using entities that he owned, Tyler had re-directed to himself commission payments that were due to the Agency, in effect stealing over $715,000 in commissions that would have eventually accrued to the TMTA. Tooling I, 2010 WL 3464329, at *2. The TMTA notified Hartford of the theft and filed a claim against the Policy. The TMTA and the Agency also filed a suit in state court against Tyler alleging misappropriation of commissions. Id.; Tooling, Mfg. & Techs. Ass’n v. Tyler (Tyler I), No. 07-081120-CZ, slip op. at 5-6 (Mich.Cir.Ct. Aug. 20, 2009). Although the TMTA and the Agency prevailed in the state court lawsuit against Tyler, Hartford refused to make a determination of coverage. See Tooling, Mfg. & Techs. Ass’n v. Tyler (Tyler II), No. 293987, 2010 WL 5383529, at *1 (Mich. Ct.App. Dec. 28, 2010); Tooling I, 2010 WL 3464329, at *2.
The TMTA brought this action in state court seeking a declaratory judgment and damages for breach of contract, and Hartford removed the case to federal district court on the basis of diversity jurisdiction. The parties filed cross-motions for summary judgment and agreed that there were no issues of disputed fact and that judgment could be rendered as a matter of law. Id. The parties dispute whether the injury suffered by the TMTA arose “directly” from Tyler’s illegal conduct while he was an employee of the TMTA. In essence, the TMTA argued that the injury was direct because the TMTA’s injury was a natural and unavoidable consequence of Tyler’s conduct, and Hartford argued that the injury was indirect because the commissions were diverted from the Agency and the Agency is not a named insured under the policy. The district court granted summary judgment to Hartford, holding that: (1) the TMTA cannot have a direct interest in the commissions due to the Agency because the Agency is a separate entity under Michigan law; (2) the Agency is not a named insured in the Policy; (3) the exclusion clause barring recovery for indirect losses applies to the commissions stolen by Tyler; and (4) Tyler only had a duty to turn the stolen commissions over to the Agency, not to the TMTA. Id. at *4-7. The TMTA filed a timely appeal.
*670 II.
We review de novo a district court’s decision on a motion for summary judgment, and summary judgment is appropriate where “the pleadings, the discovery and disclosure materials on file, and. any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.” Defoe v. Spiva, 625 F.3d 324, 330 (6th Cir.2010) (internal quotation marks and citations omitted). On summary judgment, all inferences to be drawn from the facts • must be “viewed in a light most favorable to the non-moving party.” Id. Because the parties agree that there are no material disputes of fact, the only issue is whether Hartford is entitled to judgment as a matter of law.
Subject matter jurisdiction in this case is premised solely on diversity of the parties, so we apply'Michigan law as enunciated by the Michigan Supreme Court. See, e.g., Corrigan v. U.S. Steel Corp., 478 F.3d 718, 723 (6th Cir.2007); Garden City Osteopathic Hosp. v. HBE Corp., 55 F.3d 1126, 1130 (6th Cir.1995). Where the Michigan Supreme Court has not addressed an issue, we may look to opinions issued by the Michigan appellate courts and should follow their reasoning unless we are “convinced by other persuasive data that the highest court of the state would decide otherwise.” Ziegler v. IBP Hog Market, Inc., 249 F.3d 509, 517 (6th Cir.2001). Under Michigan law, a court “must look to the language of the insurance policy and interpret the terms therein in accordance with Michigan’s well-established principles of contract construction.” Citizens Ins. Co. v. Pro-Seal Serv. Group, Inc., 477 Mich. 75, 730 N.W.2d 682, 685 (2007). Indeed, Michigan courts have recognized that “[a]n insurance policy is much the same as any other contract. It is an agreement between the parties in which a court will determine what the agreement was and effectuate the intent of the parties.” Auto-Owners Ins. Co. v. Churchman, 440 Mich. 560, 489 N.W.2d 431, 433 (1992). The Michigan Supreme Court has identified the following insurance-contract-interpretation principles:
First, an insurance contract must be enforced in accordance with its terms. A court must not hold an insurance company liable for a risk that it did not assume. Second, a court should not create ambiguity in an insurance policy where the terms of the contract are clear and precise. Thus, the terms of a contract must be enforced as written where there is no ambiguity.
While we construe the contract in favor of the insured if an ambiguity is found, this does not mean that the plain meaning of a word or phrase should be perverted, or that a word or phrase, the meaning of which is specific and well recognized, should be given some alien construction merely for the purpose of benefiting [sic] an insured. The fact that a policy does not define a relevant term does not render the policy ambiguous. Rather, reviewing courts must interpret the terms of the contract in accordance with their commonly used meanings. Indeed, we do not ascribe ambiguity to words simply because dictionary publishers are obliged to define words differently to avoid possible plagiarism.
Citizens Ins., 730 N.W.2d at 685-86 (citation omitted). .
The court applies these principles in a two-part test to determine “whether an insured is entitled to insurance benefits”: “First, we determine if the policy provides coverage to the insured. If it does, we then ascertain whether that coverage is negated by an exclusion.”[5] *671 Heniser v. Frankenmuth Mut. Ins. Co., 449 Mich. 155, 534 N.W.2d 502, 510 (1995). “Exclusionary clauses in insurance policies are strictly construed in favor of the insured .... [But] [c]lear and specific exclusions must be given effect.” Auto-Owners, 489 N.W.2d at 434. Finally, the insured has the burden to demonstrate that its claim falls within the terms of the policy. See Heniser, 534 N.W.2d at 510.
A.
In addressing whether the employee-theft clause itself entitles the TMTA to recover under the Policy, we first examine whether the Agency is covered by the Policy. If it is, then the TMTA is entitled to recover under the Policy, as Hartford freely admits. As we mentioned, the Agency is not named in the Policy as a covered insured. Although this fact might normally end our inquiry on this point, we recognize that the Agency and the TMTA are unusually consanguineous. The TMTA argues that this close relationship essentially erases any difference between the TMTA and the Agency for the purposes of the contract, that any injury to the Agency under the contract is an injury to the TMTA, that the entities are sepa *672 rate only to fulfill a technical legal requirement, and that to bar recovery because the TMTA and the Agency are technically separate would be mere sophistry. We are not convinced by the TMTA’s argument.
Rather than simply analyze the degree to which the interests of the TMTA and the Agency overlap, here we must “effectuate the intent of the parties,” Auto-Owners, 489 N.W.2d at 433 — that is, the TMTA and Hartford — and a plain reading of the Policy does not reveal that the parties mutually intended to cover the Agency under the Policy. First, the Policy states that “this Policy is for your benefit alone and no other person has any rights or benefits,” and that “[throughout this Policy the words ‘you’ and ‘your’ refer to the named Insured in the Declarations.” Since the Agency actually is separate from TMTA for legal purposes, both for the purpose of receiving insurance commissions and under the Policy, the phrase “for your benefit alone” could not have been referring to the Agency.
Second, the TMTA itself has admitted that it is separate from the Agency. As the district court noted, the TMTA argued in state court, in response to a counterclaim by Tyler, that the Agency was the entity that was due the commissions, not the TMTA, and the state court appeared to agree. See Tooling, Mfg. & Technologies Ass’n v. Hartford Fire Ins. Co. (Tooling II), No. 08-cv-11812, 2010 WL 4366878, at *1 n. 3 (E.D.Mich. Oct. 28, 2010); Tyler I, No. 07-081120-CZ, slip op. at 5-6 (“The Court finds that ... Tyler wrongfully exerted control over commissions and bonus payments that should have been paid to the Agency.” (emphasis added)); see also id. at 8-9 (“Plaintiffs’ evidence shows that Tyler made sales to TMTA members in connection with his work for the Agency, and then misdirected commissions and bonuses from those sales to his companies.... Plaintiffs assert that Tyler breached his duties by arranging for commissions and bonuses that should have been paid to the Agency to instead be paid to his companies.... ” (emphasis added)). Because Tyler did not include the Agency in his counterclaim for unpaid commissions, the TMTA argued that the state court should reject any claim by Tyler against the TMTA for commissions he should have been paid. That the TMTA would appear to agree that the Agency should be treated differently from the TMTA for some purposes supports the district court’s conclusion that the entities are treated differently under the Policy.[6]
Finally, we think it is significant that the Agency is not listed as a covered insured under the Policy even though six other entities closely related to the TMTA are. This raises the question: If the parties intended that these kinds of entities would be covered by the Policy simply because the TMTA was, why were those six enti *673 ties added to the Policy? Not only is there nothing in the contract that would contemplate that the Agency would be covered by the Policy, by adding these six additional entities the parties implicitly demonstrated an intent not to cover the Agency. Accordingly, we hold that the Agency has no rights or benefits under the Policy, and the Policy does not cover any of the Agency’s losses due to employee theft.
B.
Next, we examine whether the employee theft provision covers the TMTA’s claims — that is, whether the TMTA’s loss of income from the Agency “resulted] directly from” Tyler’s theft. The parties dispute only the word “directly” in this Policy provision. Based on the plain meaning of the word, we hold that Tyler’s theft from the Agency did not “directly” result in the TMTA’s loss.
In Michigan, “reviewing courts must interpret the terms of the contract in accordance with their commonly used meanings, ... [and] [w]hen considering a word or phrase that has not been given prior legal meaning, resort to a lay dictionary such as Webster’s is appropriate,” Citizens Ins., 730 N.W.2d at 686 (internal quotation marks and citations omitted), so we turn to the dictionary. Webster’s defines “directly” as:
la: without any intervening space or time: next in order....
2a: straight on along a definite course of action without deflection or slackening ...[;] d: simultaneously and exactly or equally
3: in close relational proximity ...[;]
4a: without any intervening agency or instrumentality or determining influence: without any intermediate step....
See Webster’s Third New Int’l Dictionary 641 (1981), available at http://unabridged. merriam-webster.com/cgi-bin/unabridged? va=directly (last visited May 23, 2012). Black’s Law Dictionary defines “directly” as:
In a direct way without anything intervening; not by secondary, but by direct, means.
Black’s further defines “direct” as:
Immediate; by the shortest course; without circuity; operating by an immediate connection or relation, Instead of operating through a medium; the opposite of indirect.
In the usual or natural course or line; immediately upwards or downwards; as distinguished from that which is out of the line, or on the side of it; the opposite of collateral. In the usual or regular course or order, as distinguished from that which diverts, interrupts» or opposes; the opposite of cross, contrary, collateral or remote.
Without any intervening medium, agency or influence; unconditional.
Finally, Black’s defines “direct loss” to mean:
One resulting immediately and proximately from the occurrence and not remotely from some of the consequences or effects thereof.
See Black’s Law Dictionary 459-60 (6th ed. 1990). The primary word used to describe “directly” in each of these definitions is “immediate,” and each of the dictionaries defines “directly” or “direct” as “without anything intervening” or “without any intervening space or time ... agency or instrumentality.” Thus, the Policy covers the TMTA only for “loss of or damage to ‘money’, ‘securities’ and ‘other property’ which results [immediately and without any intervening space, time, agency, or instrumentality] from ‘theft’ by an ‘employee.’ ” On its face, this definition would exclude the type of loss sustained by the TMTA from coverage under the Policy.
*674 Other jurisdictions have considered the meaning of the word in the context of similar insurance policies. The weight of the authorities define “directly” as meaning “immediate” — known by some as the “direct is direct” approach — although other jurisdictions espouse a “proximate cause” approach. See Direct Mortg. Corp. v. Nat’l Union Fire Ins. Co., 625 F.Supp.2d 1171, 1174-76 (D.Utah 2008) (noting that courts in various jurisdictions are split over what a “direct loss” is and siding with the “direct is direct” approach, which “requires a court to focus on whether the employer suffered actual depletion of funds as a direct (immediate) result of the employee’s conduct”); Fireman’s Fund Ins. Co. v. Special Olympics Int’l, Inc., 249 F.Supp.2d 19, 27 (D.Mass.2003) (“Courts interpreting ... [similar policies] have consistently concluded that the insured does not suffer a direct loss unless the insured’s assets, and not those of a third party, are reduced because of the offending employee’s wrongful conduct.” (citations omitted)), aff'd, 346 F.3d 259 (2003). The debate over the “directly” language first began when the Surety Association revised its standard fidelity-contract form to replace the term “loss resulting through” with “directly resulting from.” See Mass. Mut. Life Ins. Co. v. Certain Underwriters at Lloyd’s of London, No. 4791, 2010 Del. Ch. LEXIS 156, at *51-55 (Del. Ch. July 23, 2010), transferred by No. 4791, 2010 Del. Ch. LEXIS 198 (Del. Ch. Sept. 24, 2010); accord First State Bank v. Ohio Cas. Ins. Co., 555 F.3d 564, 567-70 (7th Cir.2009). This change was made to combat court cases that found coverage under fidelity policies where the “liability of the insured is based on the third party’s damage resulting from an act which, if directed against the insured, would have resulted in a covered loss.” Mass. Mutual, 2010 Del. Ch. LEXIS 156, at *53 (citation and internal quotation marks omitted); see First State Bank, 555 F.3d at 570 (noting that courts had erroneously “borrowed [causation principles] from tort law to decide loss-causation issues” in fidelity policies, and that “[insurance coverage' cases are not concerned with the philosophical social-duty underpinnings of tort law. The action sounds in contract, and our task is to interpret the parties’ agreement.” (citations omitted)). But regardless of the impetus for the “directly resulting from” language within employee fidelity policies, it remains the case that state courts and federal courts interpreting state law are split on how to interpret the provision. The policies these courts have interpreted — although differing in industry, content, and specific conduct covered — share two fundamental features: (1) they are fidelity contracts to protect against employee theft, fraud, destruction of property, or other misfeasance against the insured; and (2) they protect against a loss “directly resulting from,” “resulting directly from,” “resulting solely and directly from,” or “directly caused by” said fraud, theft, or other misfeasance. They are not liability policies, which protect the insured against liability for losses incurred by third parties due to actions by the insured’s employees. See, e.g., Vons Cos., Inc. v. Fed. Ins. Co., 212 F.3d 489, 492-93 (9th Cir.2000).
As we mentioned, at least a simple majority of courts that have considered the issue favor a “direct is direct,” or analogous reasoning, approach in employee fidelity bonds or insurance contracts — specifically, courts interpreting the law of the following states: California, Vons, 212 F.3d at 492-93; Delaware, Mass Mut., 2010 Del. Ch. LEXIS 156, at *57-58; Georgia, Citizens Bank & Trust Co. v. St. Paul Mercury Ins. Co., No. CV305-167, 2007 WL 4973847, at *3-5, 2007 U.S. Dist. LEXIS 96529, at *10-13 (S.D.Ga. Sept. 14, 2007); Illinois, First State Bank, 555 F.3d at 567-70; Iowa, City of Burlington v. *675 Western Sur. Co., 599 N.W.2d 469, 472 (Iowa 1999); Massachusetts, Fireman’s Fund, 249 F.Supp.2d at 26-28, and Commerce Bank & Trust v. St. Paul Mercury Ins. Co., No. 04-1264B, 2005 Mass.Super. LEXIS 692, at *14-15 (Mass.Sup.Ct. June 7, 2005); Minnesota, Cargill, Inc. v. Nat’l Union Fire Ins. Co., No. A03-187, 2004 Minn.App. LEXIS 33, at *30-33 (Minn.Ct. App. Jan. 13, 2004); Rhode Island, Armbrust Int’l, Ltd. v. Travelers Cas. & Sur. Co. of Am., No. 04-212, 2006 U.S. Dist. LEXIS 25640, at *5-6, *23-27 (D.R.I. May 1, 2006); Texas, Lynch Props., Inc. v. Potomac Ins. Co., 140 F.3d 622, 629 (5th Cir.1998), aff'g 962 F.Supp. 956 (N.D.Tex. 1996); Utah, Direct Mort., 625 F.Supp.2d at 1174-76; and Wisconsin, Tri City Nat’l Bank v. Fed. Ins. Co., No. 2004 WI App 12, at *801-02, 268 Wis.2d 785, 674 N.W.2d 617 (2003). Cf. Investors Title Co. v. Hammonds, 217 S.W.3d 288, 300-01 (Mo. 2007) (analyzing an employee fidelity policy and concluding that it covers only theft of the insured’s property, “provided no rights or benefits to any other person or organization,” and did not cover against third-party loss, but did not specifically state whether the phrase “resulting directly from” or some variant was included in the policy). A number of these courts have described the “direct is direct” approach as the majority rule. See First State Bank, 555 F.3d at 572 (noting that this is the “general rule”); Mass Mut., 2010 Del. Ch. LEXIS 156, at *57-58; Tri City, 2004 WI App 12, at *801-02, 674 N.W.2d 617; Commerce Bank, 2005 Mass.Super. LEXIS 692, at * 14; see also Gary J. Valeriano & Carleton R. Burch, The Interpretation of a Direct Loss Under Fidelity Bonds, 33 SUM-Br. 32, 33 (2004) (Am.Bar.Ass’n) (“Those seeking coverage under the [fidelity] bonds have argued that a ‘direct loss’ is one that is the proximate cause of the insured’s loss.... On the other hand, insurers have sought to clarify that a direct loss is one that must immediately follow the action covered.... This latter view has prevailed.”). But see Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc., 181 N.J. 245, 854 A.2d 378, 385-87 (2004) (insisting that the proximate-cause approach predominates).
Courts have applied the proximate cause approach with respect to the law of the following jurisdictions: Louisiana, First Nat’l Bank of Louisville v. Lustig, 961 F.2d 1162, 1167-68 (5th Cir.1992); Missouri, Graybar Elec. Co., Inc. v. Fed. Ins. Co., 567 F.Supp.2d 1116, 1127 (E.D.Mo. 2008); Montana, Frontline Processing Corp. v. Am. Econ. Ins. Co., 335 Mont. 192, 149 P.3d 906, 911 (2006); New Jersey, Auto Lenders, 854 A.2d at 385-87; Ohio, Retail Ventures, Inc. v. Nat’l Union Fire Ins. Co., 691 F.3d 821 (6th Cir.2012),[7] and Pennsylvania, Scirex Corp. v. Federal Ins. Co., 313 F.3d 841, 848-50 (3d Cir.2002). Cf. Aetna Cas. & Sur. Co. v. Kidder, Peabody & Co., 246 A.D.2d 202, 676 N.Y.S.2d 559, 563-66 (1998) (noting that New York insurance law generally equates a direct loss with proximate cause, but then later asserting that fidelity policies cover only the insured’s property or funds), appeal denied, 93 N.Y.2d 805, 689 N.Y.S.2d 429, 711 N.E.2d 643 (1999). But see FDIC v. National Union Fire Ins. Co., 205 F.3d 66, *676 76 (2d Cir.2000) (stating that neither Aetna nor the New York courts generally have “construed a fidelity bond’s causation requirement,” and holding that New York courts would likely adopt a “but for” standard in regards to a bank’s decision to give a loan, which results in a loss, that is caused by a fraudulent act by a bank employee).
By claiming that it was “inevitable” and “inescapable” that it would suffer a loss due to Tyler’s actions, the TMTA is essentially arguing that we should apply the “proximate cause” definition for “directly.” We decline to do so because we find the “direct is direct” approach more persuasive. As the Agency is a separate entity from TMTA, both legally and for the purposes of the Policy, Tyler’s theft of commissions intended for the Agency does not directly result in a loss to TMTA — there was an intermediate step between Tyler’s theft and TMTA’s loss, no matter how closely aligned the Agency and TMTA are. Accordingly, the Policy does not demonstrate that the parties intended to cover the TMTA’s losses due to Tyler’s misdirection of Agency commissions.
The dissent argues that we should follow an unpublished opinion by the Michigan Court of Appeals that construes, in the context of a physical property damage insurance policy, the word direct to mean “ ‘immediate’ or ‘proximate.’ ” See Acorn Inv. Co. v. Mich. Basic Prop. Ins. Ass’n, No. 284234, 2009 WL 2952677, at *2 (Mich. Ct.App. Sept. 15, 2009) (emphasis added). Although we are loath to give preclusive effect to an unpublished opinion, an opinion that does not have precedential value even in Michigan courts and which no other Michigan court has followed, see MCR 7.215(C)(1), we recognize that prior cases in this circuit have held that we should follow even unpublished state cases on points of state law unless we are “convinced by other persuasive data that the highest court of the state would decide otherwise.” Ziegler, 249 F.3d at 517. We are convinced that the Michigan Supreme Court would adopt a “direct is direct” approach were it to consider the issue.
First, as we have noted, the Michigan Supreme Court has repeatedly stated that where a term in an insurance policy has not been previously defined, the court should look to its plain meaning. See Citizens Ins., 730 N.W.2d 682, 686 (2007) (“[RJeviewing courts must interpret the terms of the contract in accordance with their commonly used meanings, ... [and] [w]hen considering a word or phrase that has not been given prior legal meaning, resort to a lay dictionary such as Webster’s is appropriate.”); accord Hall v. Equitable Life Assur. Soc’y, 295 Mich. 404, 295 N.W. 204, 206 (1940) (“It is a general rule that where the words of any written instrument are free from ambiguity in themselves, ... such instrument is always to be construed according to the strict, plain, common meaning of the words themselves.” (emphasis added)). Acorn actually cited to a dictionary that defined “direct” to mean “without intermediary agents, conditions, etc.; immediate,” which comports with our “direct is direct” approach, but the Acorn opinion chose to ignore its plain meaning in favor of a proximate cause rule adopted in other jurisdictions.[8] Acorn itself is persuasive data of the rule that the Michigan Supreme Court would adopt.
Second, we have previously recognized that “relevant data [regarding what the Michigan Supreme Court would do] also include[s] ... the majority rule among *677 other states.” Garden City Osteopathic Hosp. v. HBE Corp., 55 F.3d 1126, 1130 (6th Cir.1995). As we have noted, the weight of the authorities supports a “direct is direct” approach over a proximate cause interpretation. Third, the court in Acorn did not explicitly apply its proximate cause definition of “direct” to the facts of the case; we are left to speculate, to some extent, as to how the rule would even function in a Michigan court, which we are disinclined to do.[9] At best, the Acorn court is assuming a direct physical loss without discussion, and its lack of application is not particularly helpful to this case, which has dramatically different — even unique — facts. Further, since there are no other Michigan courts that propounded this proximate cause rule, before or since, we are left with Acoto’s paltry analysis. Finally, Acorn and Universal Images,[10] our recent, unpublished opinion interpreting Acorn, while insurance cases, dealt with a different type of insurance policy than that which is at issue here — property damage insurance versus an employee fidelity policy. As we noted, the “resulted] directly from” language was adopted specifically for employee fidelity policies for a reason — to prevent coverage for third-party losses. In this instance, to import a definition for a property damage term to a fidelity policy would be to compare apples and oranges. Cf. Tri City, 2004 WI App 12, at *801-02, 674 N.W.2d 617 (comparing casualty policies with fidelity bonds and noting that “proximate cause cases involving casualty policies are not really relevant. ... Casualty policies are written with a different intent and they rarely contain the limiting language found in fidelity bonds.”). And given that Acorn provided a somewhat vague and certainly internally inconsistent analysis of “direct” in the context of a different type of insurance policy, we believe Acorn is distinguishable from this case.
The TMTA also argues that because Tyler owed a fiduciary duty to both the TMTA and the Agency, (1) as soon as he stole the commissions that were intended for the Agency he breached his fiduciary duties to TMTA and the Agency; (2) he was required under Michigan law to hold the commissions in trust for TMTA and *678 the Agency; (3) under Michigan law he had a duty to, and could have, repaid the stolen commissions directly to TMTA rather than the Agency.[11] But whether Tyler is liable to the TMTA or the Agency under agency law is a different question from whether the Policy covers the loss of the commissions that were, as all parties admit, intended to be paid to the Agency. That Tyler breached his fiduciary duty to TMTA at the moment he diverted the commissions does not mean that he directly caused a loss to TMTA at the moment of divei'sion. That Tyler could have paid the commissions to the TMTA does not change the business environment in which Tyler, the TMTA, and the Agency operated. More importantly, it does not change the nature of the agreement between the TMTA and Hartford — the terms of which we must enforce.[12]
III.
For the foregoing reasons, we AFFIRM the judgment of the district court.

. Mich. Comp. Laws § 500.1240 (2002) ("An insurer or insurance producer shall not pay a commission, service fee, or other valuable consideration to a person for selling, soliciting, or negotiating insurance in this state if that person is required to be licensed under this chapter and is not so licensed.”). TMTA is not a licensed producer under Michigan law, so it created the Agency as a licensed producer that can lawfully receive the insurance commission payments.

. The other named insureds were: MTA Salaried Employee Defined Benefits Plan; MTA Money Purchase Pension Plan; MTA Salaried Employee Defined Contribution Plan; MTA Deferred Compensation Plan; MTA Insurance Trust; and MTA Dental Trust.

. The Considerations clause of the Policy also placed an emphasis on "direct” harms:
In exchange for the payment of premium and subject to the Declarations, Insuring Agreements, Definitions, Exclusions, General Conditions, and terms of the Policy, we will pay for loss which you sustain resulting directly from acts committed or events occurring after the RETROACTIVE DATE shown in the SCHEDULE and discovered by you during the Policy Period shown in the Declarations or during the period of time provided in the EXTENDED PERIOD TO DISCOVER LOSS General Condition.

. On appeal, Hartford argues that Tyler's actions do not qualify as a "theft” under the Policy. Because Hartford did not make this argument to the district court, the argument *669 is forfeited barring a "plain miscarriage of justice,” which is not the situation here. See, e.g., Dealer Computer Svcs., Inc. v. Dub Herring Ford, 623 F.3d 348, 357 (6th Cir.2010).

. The district court declined to address the first step of Michigan’s rule, collapsing the two-part inquiry into one by stating that *671 "[t]he question, then, is whether TMTA's loss due to Tyler’s theft was indirect. If the loss falls into one of the examples of indirect loss provided in the Policy, TMTA’s loss is excluded from coverage.” Tooling I, 2010 WL 3464329, at *4. The district court chose to interpret the meaning of a direct loss by its interpretation of an indirect loss under the exclusions clause. In other words, because the type of loss claimed by the TMTA is an indirect loss barred by the exclusions clause, it is not a direct loss under the employee theft provision. This is wrong for two reasons. First, we must follow Michigan law in this case, and the Michigan courts have clearly articulated a conditional two-part inquiry — if the first step is met, then the second may be taken, not the other way around.
Still, the error would have been harmless had the exclusions clause been appropriate in this case, which brings us to our second reason: the district court incorrectly interpreted the Policy’s "indirect loss” exclusions clause. The clause begins by excluding loss "that is an indirect result of any act or ‘occurrence’ covered by this Policy,” and then gives several examples of indirect loss that is excluded, including "your inability to realize income that you would have realized had there been no loss of or damage to ‘money’, 'securities’ or 'other property’.” R. 37, Ex. D., part V.H., PG ID 410 (emphasis added). We conclude, based on a plain reading of the provision, that this clause applies where there is direct loss— covered by the Policy — from which the insured derives indirect losses, which are not. See Patrick Schaumburg Autos., Inc. v. Hanover Ins. Co., 452 F.Supp.2d 857, 871-72 (N.D.Ill.2006) (analyzing a very similar exclusions clause and stating that "the indirect loss exclusion at issue here is not ambiguous.... [T]he policy draws a distinction between the loss of the intrinsic value of the asset, which is [covered], and the loss of the asset’s potential for generating income including profit, which is excluded.”); see also Benchemark Printing, Inc. v. Am. Mfrs. Mut. Ins. Co., No. 00-CV-0865, 2001 WL 66310, at *3, 2001 U.S. Dist. LEXIS 619, at *7-8 (N.D.N.Y Jan. 26, 2001) ("The policy contains a provision which excludes from coverage the insured's 'inability to realize income that [it] would have realized had there been no loss of ... Covered Property.' ... [T]he plaintiff claims that the 'covered property’ is lost profits. Therefore, in order for the exclusion to apply, the plaintiff would have to be seeking to recover the income it would have realized from the lost profits, such as interest. However, that is not what the plaintiff is claiming. Rather, the plaintiff's claimed loss is allegedly the covered property, not the inability to realize income from the covered property. Accordingly, the insurance policy’s provision which excludes indirect losses from coverage does not apply in this case.”); cf. Heniser, 534 N.W.2d at 510 ("Policy exclusions are based on the presumption that the insured already has established that the policy covers the property in question. The question then becomes whether this particular loss is excluded from coverage for some reason.”). Here there is only one type of loss, the diverted commissions — they are either covered by the Policy or, as we find in this case, they are not. The exclusions clause simply does not apply.

. The, district court also held that it would not "disregard the distinction the law makes between the [Agency and TMTA], and dishonor TMTA’s business decision to create the Agency as [a] separate legal entity and not add it as an insured to the Policy.” Tooling I, 2010 WL 3464329, at *4. It is true that Michigan law treats limited liability companies separately from their members. See Mich. Comp. Laws § 450.4504(2) ("A member has no interest in specific limited liability company property.”); Trident-Allied Assocs., LLC v. Cypress Creek Assocs., LLC, 317 F.Supp.2d 752, 754 (E.D.Mich.2004) ("[The] Michigan legislature fashioned the limited liability company to be a legal entity distinct from its members.”); Wells v. Firestone Tire & Rubber Co., 421 Mich. 641, 364 N.W.2d 670, 674 (1985) (“We recognize the general principle that in Michigan separate entities will be respected.”). But we caution that because the issue is one of contract interpretation, whether the Agency is distinct from the TMTA for legal purposes — while germane to our deliberation— must be carefully distinguished from whether the Agency is covered under the Policy.

. In this recent case, this court found that "the phrase 'resulting directly from' does not unambiguously limit coverage” to a "direct as direct” approach and so holds that "the Ohio Supreme Court would apply a proximate cause standard” simply because it is the more liberal construction. Id. at 830-32. The plaintiff in Retail Ventures was only able to cite a pair of old Ohio appellate decisions from other first-party coverage contexts to support their position. Id. at 830-31. The court noted that "[t]he Ohio courts have not decided whether to apply proximate cause in the context of a fidelity bond or commercial crime policy.” Id.

. See Acorn, 2009 WL 2952677, at *2 (citing de Laurentis v. United Services Automobile Ass’n, 162 S.W.3d 714, 723 (Tex.App.2005); Cresthill Indust. v. Providence Wash. Ins. Co., 53 A.D.2d 488, 385 N.Y.S.2d 797, 803-04 (N.Y.Sup.Ct.1976)).

. This is the entirety of the discussion in Acorn about the meaning of "direct” within the insurance policy:
Here, the insurance policy expressly requires that "direct physical loss” be caused by the act of vandalism. The use of the word “direct” signals "immediate” or “proximate” cause, as distinct from remote or incidental causes, de Laurentis v. United Services Automobile Ass’n, 162 S.W.3d 714, 723 (Tex.App.2005); see also Roundabout Theatre Co. v. Continental Cas. Co., 302 A.D.2d 1, 8, 751 N.Y.S.2d 4 (2002) (plain meaning of the words "direct” and "physical” preclude any off-site property damage); Random House Webster’s College Dictionary (1997), p. 371 (defining “direct,” in pertinent part, as “without intermediary agents, conditions, etc.; immediate”). But causation does not require that vandalism be the last act in the chain of events upon which the loss is based. Cresthill Industries, Inc. v. Providence Washington Ins. Co., 53 A.D.2d 488, 498-499, 385 N.Y.S.2d 797 (1976). The removal of severed fixtures from the premises does not change the essential character of a completed act of vandalism. Id. at 497, 385 N.Y.S.2d 797. Because no genuine issue of material fact was shown with respect to whether an act of vandalism, as understood in its plain and ordinary sense, occurred in this case, the trial court erred in finding that the vandalism peril was inapplicable as a matter of law. But because the parties’ evidence was not directed at or factually developed with regard to the particular items of "direct physical loss” that plaintiff sought to recover under the policy, we cannot conclude that either party was entitled to summary disposition with respect to the amount of plaintiff's covered loss.
Acorn, 2009 WL 2952677, at *2.

. 475 Fed.Appx. 569 (6th Cir.2012).

. The TMTA also argues that because the Agency did not have any employees it could not have been covered by an employee theft policy, and that "[t]he trial court’s reasoning therefore forecloses TMTA from ever being able to secure insurance for employee theft which occurs in the course of performing Agency insurance work.” Appellant’s Br. at 24. But the Policy clearly states that "[a]n ‘employee’ of any Insured is considered to be an ‘employee’ of every Insured”; there was nothing to prevent the Agency from being covered by the Policy had the TMTA added it as a named insured. The TMTA argues that this provision is unclear, but it seems clear to us: if the employee of one covered insured steals from another covered insured, the employee is treated as if he or she were employed by both and the theft is covered.

. The TMTA cites a number of insurance contract cases to support the position that it suffered a direct loss, but these cases are distinguishable. See Phillip R. Seaver Title Co., Inc. v. Great Am. Ins. Co., No. 08-CV-11004, 2008 WL 4427582 (E.D.Mich. Sept. 30, 2008) (distinguishable because it involved employee theft of funds from a bank account of a covered insured, which the covered insured replenished with funds from another of its accounts); Dewitt Bldg. Co. v. Auto-Owners Ins. Co., No. 235536, 2003 WL 21362804 (Mich.App. June 12, 2003) (distinguishable because the loss claimed by the plaintiff was different in nature from the loss claimed by the TMTA, and in any event does not demonstrate that the TMTA’s loss was direct); Morris Kirschman & Co., L.L.C. v. Hartford Fire Ins. Co., No. 03-1743, 2004 WL 1934848 (E.D.La. Aug. 30, 2004) (distinguishable because the basis for the claim was expressly included by the coverage clause in the policy and the employee fraud was perpetrated on the covered insured)-, Peoples Sav. Bank of Grand Haven v. Am. Sur. Co. of New York, 15 F.Supp. 911, 913-14 (W.D.Mich.1936) (distinguishable because in the banking industry there was an industry practice of automatically paying traveler’s checks that the insured bank and the insurance company would have been aware of and would have intended to cover in the insurance policy).