RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0087p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

US FRAMING INTERNATIONAL LLC,

                               *Plaintiff-Appellant*,

    *v.*

No. 23-6001

CONTINENTAL BUILDING COMPANY; RICK ADANTE;
TODD ALEXANDER; BRENT BAKER; CHRIS ITALIANO;
GREGORY RAY; PAUL SOHA,

                               *Defendants-Appellees*.

─────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
3:23-cv-00249—Travis Randall McDonough, District Judge.

Decided and Filed:  April 7, 2025

Before:  GILMAN, STRANCH, and LARSEN, Circuit Judges.

─────────────

**COUNSEL**

**ON BRIEF:**  Daniel Bryan Thomas, Kyle Doiron, Timothy Alex Rodriguez, BRADLEY ARANT BOULT CUMMINGS LLP, Nashville, Tennessee, for Appellant.  Richard Kalson, COZEN O'CONNOR, New York, New York, W. Paul Whitt, LEWIS THOMASON, P.C., Knoxville, Tennessee, for Appellees.

─────────────

**OPINION**

─────────────

LARSEN, Circuit Judge.  Continental Building Co., a general contractor, entered into a subcontract with US Framing International for framing services on two student-housing projects. After a disagreement arose between the parties, US Framing left the project, and Continental filed an insurance claim on the premise that US Framing had breached the subcontract.

US Framing then sued Continental and several of its officers, alleging that Continental had committed insurance fraud under Tennessee law. The district court granted Continental's motion to dismiss because US Framing failed to plead any injury directly caused by Continental's allegedly fraudulent insurance claim. We AFFIRM.

I.

Continental contracted with US Framing for framing work on two student-housing projects—one in Knoxville, Tennessee, the other in Ann Arbor, Michigan. US Framing began work on the projects in 2017. Things didn't go well. US Framing and Continental soon began fighting about delays on the Knoxville project; each party blamed the other. In December 2017, the parties amended the subcontract. They agreed to "wipe the slate clean" by abandoning all delay-related claims against one another. R. 1-2, Compl., PageID 17. That didn't quite solve things. The next month, the parties agreed that US Framing would leave the Knoxville project. The parties executed another "change order," which provided that "[US Framing] will leave the job, and [Continental] will make no more payments, and these actions will suffice to complete the contract between the two parties with no recourse by either party." *Id.* at 18.

In February 2018, Continental sent US Framing a notice of termination on the Knoxville project. Continental informed US Framing that it was terminating the subcontract because of US Framing's "failure to commence and satisfactorily continue correction of its previously noticed Subcontract defaults." *Id.* at 47. Continental also stopped paying US Framing on the Ann Arbor project.

Several weeks later, Continental told its subguard insurer,[1] Steadfast Insurance Co., that US Framing had defaulted on the Knoxville subcontract. Continental submitted a claim under its policy for around $2.8 million, which it later amended to allege over $6 million in damages. Steadfast paid Continental more than $3.1 million on the claim.

---

[1]A subguard insurance policy protects general contractors against subcontractor default. The general contractor takes out the policy. If the subcontractor defaults on the subcontract, the general contractor may file a claim with its subguard insurer. The insurer then pays the general contractor and assumes the general contractor's rights against the subcontractor.

The dispute between US Framing and Continental gave rise to several lawsuits. US Framing first sued Continental in Michigan state court in 2018, seeking the remainder that Continental allegedly owed on the Ann Arbor subcontract. Eventually, the parties agreed to arbitrate claims relating to both the Ann Arbor and Knoxville projects. In May 2024, the arbitrator made a final determination, awarding US Framing more than $2.9 million.[2] Second, in 2021, US Framing sued Continental in Tennessee state court, seeking a declaratory judgment that US Framing did not default on the Knoxville subcontract, that Continental's losses did not arise out of any alleged default by US Framing, and that Continental made material misstatements and omissions in submitting its subguard claim to Steadfast. After Continental removed the case to federal court, the district court dismissed the case, concluding that US Framing's claim was time-barred.

Finally, US Framing filed this action in Tennessee state court in 2023. US Framing sued Continental and six of its executives under a Tennessee statute banning fraudulent or unlawful insurance acts. *See* Tenn. Code Ann. § 56-53-101 *et seq.* We will refer to this statute as "the Act." US Framing alleged that Continental and its executives committed insurance fraud by making misrepresentations and omissions in submitting the subguard claim. Defendants then removed the case to federal court and moved to dismiss the complaint. The district court granted defendants' motion to dismiss. US Framing timely appealed.

II.

We begin with three non-merits issues: whether complete diversity exists; whether the forum-defendant rule bars removal in this case; and whether the complaint's allegations satisfy the amount-in-controversy requirement.

*Complete diversity.* A federal court may not exercise diversity jurisdiction unless the parties are completely diverse. *See Akno 1010 Mkt. Street St. Louis Mo. LLC v. Pourtaghi*,

---

[2]US Framing attached the Final Arbitration Award to its opening appellate brief, but the Final Award was not included in the record below. US Framing asks this court to take judicial notice of the adjudicative facts in the Final Award. However, parties are generally not allowed to introduce new evidence on appeal. *See, e.g.*, *Abu-Joudeh v. Schneider*, 954 F.3d 842, 848 (6th Cir. 2020). We merely note the arbitrator's final award by way of background.

43 F.4th 624, 626 (6th Cir. 2022). US Framing is a limited liability company, or "LLC," and LLCs have the citizenship of each of their "members and sub-members." *Id.* "Unlike a corporation, an LLC's state of organization does not establish its citizenship." *Id.* (citing 28 U.S.C. § 1332(c)(1)). So "[w]hen diversity jurisdiction is invoked in a case in which a limited liability company is a party, the court needs to know the citizenship of each member of the company." *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009). Just one non-diverse member or sub-member can destroy diversity jurisdiction. *Id.*

The Federal Rules of Civil Procedure require parties to file a "disclosure statement" in cases based on diversity jurisdiction. The disclosure "must name—and identify the citizenship of—every individual or entity whose citizenship is attributed to that party or intervenor when the action is filed or removed to federal court." Fed. R. Civ. P. 7.1(a)(2) (cleaned up). That requirement helps "facilitate an early and accurate determination of jurisdiction," which in turn "protect[s] against the waste that may occur upon belated discovery of a diversity-destroying citizenship." *Id.* advisory committee's note to 2022 amendment.

Here, neither party fully complied with Rule 7.1. Below, the district court noted the defendants' initial failure to file a disclosure statement after removing the case to federal court. The defendants filed a statement in response, but that statement failed to plead plaintiff US Framing's citizenship. Perhaps the defendants didn't know it and couldn't find it. After all, the committee notes recognize that "[a] party suing an LLC may not have all the information it needs to plead the LLC's citizenship." *Id.* The same logic holds for a defendant sued by an LLC, who seeks to remove a case to federal court. But as the party asserting diversity jurisdiction, the removing-party defendants bore the burden of establishing each party's citizenship. *Akno*, 43 F.4th at 627. They failed to do so. And although the defendants' disclosure statement partially cured their initial error, US Framing never filed *any* disclosure statement or otherwise informed the court of its members' citizenship. So the parties' representations failed to assure us of our jurisdiction. We ordered supplemental briefing on the question.

We are now assured that complete diversity exists. The defendants are citizens of Ohio and Indiana (and possibly Tennessee, as we'll turn to in a moment). And both parties agree that US Framing's members are all citizens of Kentucky. That said, we urge the parties, in future

cases, to take heed of both Rule 7.1's requirements and the interaction between the complete-diversity requirement and LLC citizenship.

*The forum-defendant rule*. In its supplemental briefing addressing the complete-diversity question, US Framing alleged what it believed to be a separate jurisdictional defect based on the home-state defendant rule. The federal removal statute forbids a home-state defendant from removing a case to federal court. 28 U.S.C. § 1441(b)(2). That limit accords with the notion that diversity jurisdiction primarily exists to protect out-of-state litigants from hometown bias. *See Hertz Corp. v. Friend*, 559 U.S. 77, 92 (2010). US Framing alleges that one of the defendants, Gregory Ray, is a home-state defendant for purposes of this rule. But the forum-defendant rule is not jurisdictional. *See Handy-Mack Co. v. Godchaux Sugar Co.*, 2 F.3d 435, 437 (6th Cir. 1924); *see also Lively v. Wild Oats Mkts., Inc.*, 456 F.3d 933, 939–40 (9th Cir. 2006) (noting that eight other circuits have held the same). So it is subject to 28 U.S.C. § 1447(c), which requires parties to file "[a] motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction . . . within 30 days after the filing of the notice of removal." US Framing failed to do that here, so it cannot now object based on Ray's alleged Tennessee citizenship.

*Amount in controversy*. We address one last jurisdictional argument made by US Framing. US Framing argues that if, as Continental contends, it failed to plead any damages recoverable under §§ 56-53-102 or 103, then the amount-in-controversy requirement is not met, and subject-matter jurisdiction is lacking. *See* 28 U.S.C. § 1332. Therefore, US Framing urges, the proper remedy would be a remand to state court rather than dismissal for failure to state a claim. We reject that argument.

Continental removed this case to federal court, so it has the burden of establishing federal jurisdiction. To meet this burden, Continental had to show "that the allegations in the complaint at the time of removal satisfy the amount-in-controversy requirement." *Northup Props., Inc. v. Chesapeake Appalachia, L.L.C.*, 567 F.3d 767, 769–70 (6th Cir. 2009). "If removal of a civil action is sought on the basis of [diversity] jurisdiction . . . , the sum demanded in good faith in the initial pleading shall be deemed to be the amount in controversy . . . ." 28 U.S.C. § 1446(c)(2). But where, as here, the plaintiff's complaint contains no *ad damnum* clause specifying an amount of damages, a removing defendant may rely on a "fair reading of [the

plaintiffs'] complaint" to establish the amount in controversy.  *See Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 573 (6th Cir. 2001).

Here, Continental met its burden.  In filing its notice of removal, Continental asserted that the amount in controversy exceeds $75,000.  And Continental noted that the complaint's factual allegations clearly set forth an amount in controversy well above $75,000.  Our independent review of the complaint's allegations confirms that the amount-in-controversy requirement was satisfied here.  US Framing plainly alleged that Continental's fraud caused it "over a million dollars in damages."  R. 1-2, Compl., PageID 24.

For purposes of the amount-in-controversy requirement, that was sufficient.  Any *merits* determination that US Framing cannot recover those damages—*e.g.*, because they did not "directly result[] from" Continental's fraud under Tenn. Code Ann. § 56-53-107(b)(1)(C)—does nothing to disprove the *jurisdictional* assertion that the parties sufficiently set in controversy an amount greater than $75,000.  "To accept Plaintiff's contrary argument would mean that every time a defendant removed a case on the grounds of diversity jurisdiction, it would concede its liability for at least $75,000.  Nothing in the Federal Rules of Civil Procedure, its interpretive jurisprudence, or simple logic supports such an outcome."  *Schor v. State Farm Fire & Cas. Ins. Co.*, 2015 WL 1230200, at *4 n.1 (E.D. Pa. Mar. 18, 2015); *see also* 14B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3703 (5th ed. June 2024 update) ("A removing defendant who seeks to establish that the amount in controversy is greater than the jurisdictional requirement does not automatically concede that it is recoverable.").

### III.

Satisfied that jurisdiction exists, we turn to the merits.  "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to state a claim to relief that is plausible on its face."  *Aschcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  Although we must accept factual allegations as true, we need not accept legal conclusions.  *Sturgill v. Am. Red Cross*, 114 F.4th 803, 807 (6th Cir. 2024).  We review de novo a district court's grant of a motion to dismiss for failure to state a claim.  *Id.* at 808.

In 2001, the Tennessee legislature passed an Act prohibiting insurance fraud.  *See* Tenn. Code Ann. § 56-53-101 *et seq.*  Two sections of the Act set forth criminal and civil insurance-fraud violations, respectively.  *Id.* §§ 56-53-102, 103.  Another section provides that "any person injured in the person's business or property by reason of a violation" may sue to "recover for the injury" from the fraudster.  *Id.* § 56-53-107(a)(1), (b)(1).  However, the statutory scheme makes different remedies available, depending on whether the underlying violation was civil or criminal.  For civil violations, an injured party may recover (1) the "[r]eturn of any profit, benefit, compensation or payment received by" the violating party; and (2) "[r]easonable attorneys' fees [and] related legal expenses."  *Id.* § 56-53-107(a)(1)(A)–(B).  For criminal violations, an injured party may recover the aforementioned remedies as well as (3) "[a]ll other economic damages directly resulting from the violation"; (4) reasonable investigative fees; and (5) a penalty up to $10,000.  *Id.* § 56-53-107(b)(1)(A)–(E).  The Act also permits any person injured by a criminal violation to "recover threefold the injured person's economic damages" if he can show by "clear and convincing evidence that the violation was part of a pattern or practice."  *Id.* § 56-53-107(c).

US Framing alleges that it is entitled to several forms of relief: economic damages caused by Continental's alleged fraud; treble damages; attorney's fees and related legal expenses; and the statutory penalty.  We address the availability of each form of relief in turn.

A.

We first consider whether US Framing has plausibly alleged that it suffered economic injury "directly resulting" from Continental's alleged insurance fraud.[3]  We conclude that it has not.

---

[3]We note at the outset that economic damages are available only to "[a]ny person injured in the person's business or property by reason of a violation of § 56-53-102." Tenn. Code Ann. § 56-53-107(b)(1).  That provision establishes "criminal violations."  *Id.* § 56-53-102.  In the district court, Continental argued that US Framing, as a private plaintiff, could not maintain a suit for damages arising out of a violation of this provision because § 56-53-107(d) "makes clear that criminal violations . . . fall within the prosecutorial authority of the Tennessee attorney general, district attorney, or other prosecutorial agency." R. 17, Mem. in Supp. of Mot. to Dismiss, PageID 343. The district court did not rule on this question, instead concluding that US Framing could not prevail because its injuries "did not 'directly result' from Continental's alleged insurance fraud." R. 22, D. Ct. Op. & Order, PageID 878.  Because we agree with the district court on this score, we need not address the interaction between the State's prosecutorial authority under § 56-53-102 and the civil remedies established in § 56-53-107 for criminal violations.

1.

The Act provides for "economic damages *directly* resulting from" a fraudulent insurance act. Tenn. Code Ann. § 56-53-107(b)(1)(C) (emphasis added). The scope of relief available under the statute is a matter of state law, on which we are bound by the decisions of the Tennessee Supreme Court. *See In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014). But Tennessee's highest court has not addressed what it means for damages to "directly result[] from" a fraudulent insurance act. Where no authoritative state-law judgment addresses the issue at hand, we must predict how that court would interpret state law. *Id.* In doing so, we consider "all available data," including state appellate decisions. *Id.*

Following the district court's lead, the parties have pitched the interpretative question as a choice between two sides in a long-standing debate over how to interpret "direct" or "directly" in insurance contracts. *See Tooling, Mfg., & Techs. Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665, 674 (6th Cir. 2012) (noting a split); *Retail Ventures Inc. v. Nat'l Fire Ins. Co. of Pittsburgh*, 691 F.3d 821, 828 (6th Cir. 2012) (same). Continental advocates the "direct is direct" approach in which a harm results "directly" from a covered loss when it follows "immediately" or "without anything intervening." *Tooling*, 693 F.3d at 673, 676–77 (concluding that Michigan would adopt the "direct is direct" approach to insurance contract interpretation). US Framing, by contrast, urges us to adopt an approach incorporating proximate-cause standards. *See Retail Ventures*, 691 F.3d at 831–32 (concluding that Ohio would adopt the "proximate cause" approach); *see also Int'l Paper Co. v. Beazley Ins. Co.*, 731 F. Supp. 3d 1013, 1041–42 (W.D. Tenn. 2024) (relying, in part, on *Retail Ventures* to conclude that Tennessee would adopt the "proximate cause" approach).

We decline to engage in this debate for several reasons. First, we are interpreting a statute, not an insurance contract. To be sure, contract and statutory interpretation often follow similar rules. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 400 (Tenn. 2013) (explaining that Tennessee courts "apply the plain meaning" when statutory text is clear); *Garrison v. Bickford*, 377 S.W.3d 659, 664 (Tenn. 2012) (stating that insurance contracts should generally be interpreted in accordance with "their plain and ordinary meaning" (citation

omitted)).  But the two are not identical.  For example, in Tennessee, various pro-insured rules of construction guide the interpretation of insurance contracts.  *See Garrison*, 377 S.W.3d at 644 ("[C]ontracts of insurance are strictly construed in favor of the insured, and if the disputed provision is susceptible to more than one plausible meaning, the meaning favorable to the insured controls.").  Where appropriate, those rules of construction have guided this court in predicting how state courts would define the term "direct" in insurance contracts.  *See Retail Ventures*, 691 F.3d at 831.  But those canons make the insurance-contract analogy a poor fit for predicting how the Tennessee Supreme Court would rule on this question of *statutory* interpretation.  Whatever their effect in Tennessee insurance-contract interpretation, pro-insured canons certainly have no home in the interpretation of a statute designed to thwart fraud *by* the insured.  *See Steakhouse v. W. World Ins. Grp.*, 2023 WL 6131092, at *6 (W.D. Tenn. Sept. 19, 2023) (noting that the Act "applies only to *insureds* and *their* representations").

Second, and more importantly, the choice between the "direct is direct" and the "proximate cause" approach does not affect the resolution of this case.  That's because Continental's alleged insurance fraud is not even the *factual* cause of some of US Framing's claimed items of damage.  And the remainder fail even the test of *proximate* cause under the legal regime that most closely resembles the case at hand—Tennessee law pertaining to fraud.

2.

The precise question before us is whether US Framing's claimed damages "directly resulted" from Continental's alleged insurance fraud.  We consider each alleged item of damage separately.

First, US Framing claims damages in the form of lost payments on the Ann Arbor project.  US Framing alleges that Continental stopped paying it because the subguard policy required Continental to cease payment to the defaulting party (on any project) upon receipt of payment from the insurer.[4]  But we need not resort to any direct-proximate distinction to dismiss this theory of injury.  US Framing did not suffer these damages as a direct *or* proximate result of

---

[4]Although US Framing attached the policy to its complaint, US Framing does not point us to a particular provision of the policy requiring Continental to stop making payments to US Framing on other projects.

Continental's alleged fraud. The complaint alleges that Continental stopped paying US Framing on the Ann Arbor project *before* filing the subguard claim. So Continental's submission of allegedly false insurance claims, which ultimately triggered the stop-payment obligation, was not even a cause-in-fact of US Framing missing out on payments from Continental.

In its brief on appeal, US Framing suggests that we may reasonably "infer" that Continental ceased payment on the Ann Arbor contract "with its Subguard scheme in mind." Appellant Br. at 13. But US Framing did not advance this theory in the district court. And the complaint itself makes no such allegation. US Framing does not allege that Continental had a pre-existing plan to file false insurance claims regarding the Knoxville project and, as part of that plan, stopped payment on the Ann Arbor project even before any such obligation was triggered. In sum, US Framing cannot claim the lost Ann Arbor payments as "economic damages directly resulting from" Continental's alleged fraud on its insurer because that fraud was not even the factual cause of the loss.

Second, US Framing alleges that Steadfast's payment on the subguard policy obligated Continental to pursue subrogation litigation against US Framing, resulting in significant litigation expense to US Framing in the Michigan action. But there are several problems with this theory. Even assuming that litigation expenses count as "economic damages" under the statute,[5] Continental's alleged fraud is not a but-for cause of at least some of US Framing's litigation expenses. Although the Michigan state-court litigation began after Continental filed its allegedly fraudulent claim, US Framing *itself* filed suit. The direct cause of that litigation was that Continental stopped paying US Framing on the Ann Arbor subcontract. As explained above, Continental stopped paying before filing its subguard claim, and US Framing's complaint does

---

[5]American courts do not ordinarily treat litigation expenses as damages. *See* 25 C.J.S. Damages § 72 (Dec. 2024 update) ("Generally, litigation expenses and attorney's fees are not recoverable as damages."). However, "[u]nder some circumstances, a plaintiff can recover from a defendant the litigation expenses and attorney's fees incurred as a result of separate litigation *against a third party*." *Id.* § 76 (emphasis added). "[W]here the wrongful act of one person has involved another in litigation, or has made it necessary for that other person to incur expenses to protect its interests, litigation expenses, including attorney's fees, are recoverable as damages." *Id.* But this rule "generally has no application where the prior litigation was between the parties to the present suit." *Id.* That's exactly the situation here: US Framing and Continental were parties to both the prior and present suits. Thus, there's good reason to doubt whether US Framing's prior litigation expenses even qualify as economic damages recoverable under the statute.

not allege that this act was a part of the fraud. Given that the cause of the litigation predates the alleged fraud, it's hard to conceive of how the alleged fraud caused the litigation.

That said, perhaps Continental's alleged fraud was the but-for cause of *some* unknown portion of US Framing's litigation expenses. The district court suggested that "[t]he parties may have resolved the disputes more quickly and less expensively absent Continental's insurance proceeds [which] financed the litigation." R. 22, D. Ct. Op. & Order, PageID 878. That could be true. Perhaps, but for Continental's receipt of allegedly fraudulent insurance proceeds, Continental would have been more inclined to settle. On that theory, the fraud was a but-for cause of at least some of US Framing's expenses.

But even assuming but-for causation with respect to some of the litigation expenses, US Framing still cannot recover. US Framing's allegedly increased litigation expenses are entirely derivative of the harm caused to Continental's insurer—the primary victim of the alleged fraud. And as we read Tennessee law pertaining to fraud and misrepresentation, such harms are too remote, regardless of whether we use a "direct" or "proximate" cause standard.

*"Direct" cause*. Tennessee courts generally apply a statute's plain meaning. *See, e.g.*, *Mansell*, 417 S.W.3d at 400; *Abels ex rel. Hunt v. Genie Indus., Inc.*, 202 S.W.3d 99, 102 (Tenn. 2006); *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). And they often turn to dictionaries as a guide. *See Garrison*, 377 S.W.3d at 669–70; *State v. Deberry*, 651 S.W.3d 918, 927 (Tenn. 2022). Modern dictionaries typically define "directly" to mean "immediately" or "without anything intervening." *Tooling*, 693 F.3d at 673 (quoting dictionaries); *see also Directly*, Black's Law Dictionary (12th ed. 2024) (defining "directly" as "[i]n a straightforward manner"; "[i]n a straight line or course"; "[i]mmediately"); *Directly*, Am. Heritage Coll. Dictionary (4th ed. 2007) (defining "directly" as "without anyone or anything intervening").

Moreover, the Tennessee Supreme Court has interpreted "directly" in a similar fashion, albeit in a different statutory context. Drawing on its "commonly understood" "dictionary meaning," Tennessee's high court read "directly" in a tax statute to mean "in direct contact with, and without the intervention of any person or thing." *Phillips & Buttorff Mfg. Co. v. Carson*, 217 S.W.2d 1, 5 (Tenn. 1949). Using this definition, the court held that coal and fuel oil used to

operate power generators were not tax exempt as "industrial materials . . . used *directly* in fabricating, converting, or processing such material." *Id.* at 2, 5. US Framing offers no countervailing dictionary definition.

If "directly" means "immediately" or "without the intervention of any person or thing," then US Framing's increased litigation costs were not the "direct[] result[]" of Continental defrauding its insurer. That's because "there was an intermediate step between" Continental's alleged fraud on its insurer and US Framing's increased litigation costs. *Tooling*, 693 F.3d at 676.

*"Proximate" cause*. US Framing posits that "directly resulting," as used in the Act, does not require that the harm be the immediate result of the fraud; instead, US Framing argues that the statute incorporates the concept of "proximate cause." But even if this is so, US Framing cannot prevail under our understanding of Tennessee law.

US Framing contends that Tennessee courts would read "directly resulting" *in an insurance contract* to mean "proximately caused." *See Int'l Paper Co.*, 731 F. Supp. 3d at 1041–42 (reading Tennessee law as likely to adopt the proximate-cause approach to interpreting "direct loss" in a commercial-crime insurance policy); *Farmers Mut. Fire Ins. Co. v. McMillan*, 395 S.W.2d 798, 799 (Tenn. 1965) (reading "direct loss by fire" in a fire insurance contract to be "synonymous with proximate cause"). That might be so, but we are not persuaded that it would matter here. The Act is not an insurance contract; it is a fraud statute. And although the Tennessee courts have not interpreted "direct[] result[]" as used in the Act, they have explained how proximate cause plays out in other statutory and common-law claims based on fraud and misrepresentation. *See Steamfitters Loc. Union No. 614 Health & Welfare Fund v. Philip Morris, Inc.*, 2000 WL 1390171, at *3–7 (Tenn. Ct. App. Sept. 26, 2000); *see also Tenn. Med. Ass'n v. BlueCross BlueShield of Tenn.*, 229 S.W.3d 304, 308 (Tenn. Ct. App. 2007). We think these cases provide a better guide to how the Tennessee courts would rule in this case.

In *Steamfitters*, a Tennessee appellate court dismissed a complaint brought by union health and welfare funds against tobacco companies. 2000 WL 1390171, at *1. The complaint alleged common law "fraud and deceit, negligent misrepresentation, conspiracy, and violation of

the TCPA," that is, the Tennessee Consumer Protection Act.[6]  *Id.* at \*3.  The funds alleged that they had incurred additional healthcare costs because the tobacco manufacturers had defrauded the funds' *participants*—not the funds themselves.  *Id.* at \*1.  In other words, the state court explained, the funds' injuries were "entirely derivative" of injuries the participants incurred "as a result of using tobacco products."  *Id.* at \*6.  Applying "the doctrine of proximate cause," the court noted that "to be actionable, conduct must be more than a remote cause of injury."  *Id.* at \*3 (citing *Doe v Linder Const. Co.*, 845 S.W.2d 173, 181 (Tenn. 1992)).  The court then concluded that because the funds' injuries were "purely contingent on harm to third parties," they were too remote and indirect "as a matter of law" to come within the doctrine of proximate cause.  *Id.* at \*6–7.  This court subsequently relied on *Steamfitters*' reasoning to dismiss similar claims brought under Tennessee law as "too remote."  *See Perry v. Am. Tobacco Co., Inc.*, 324 F.3d 845, 850–51 (6th Cir. 2003).

Given this caselaw, US Framing's claims fail.  Even if US Framing is correct that, in the insurance-fraud context, "direct" means "proximate," Tennessee law governing fraud claims holds that contingent injuries, like the one US Framing alleges here, are too remote to satisfy proximate cause.

One final note.  We have previously stated that "federal courts must be cautious when making pronouncements about state law."  *In re Darvocet*, 756 F.3d at 937.  So if we are conflicted between choosing a narrow interpretation of state law and a broader one that "greatly expands liability," we should favor the narrower interpretation when exercising diversity jurisdiction.  *Id.* (quoting *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004)).  That rule serves both judicial modesty and federalism.  "Federal courts sitting in a diversity case are in a particularly poor position to endorse a fundamental policy innovation" in state law "absent some authoritative signal" favoring the innovation.  *Combs*, 354 F.3d at 577–78 (cleaned up).  Here, US Framing invites us to adopt a broad, liability-expanding interpretation of Tennessee law but

---

[6]The TCPA forbids companies from "engaging in any . . . act or practice which is deceptive to the consumer."  Tenn. Code Ann. § 47-18-104(b)(27).  The Tennessee Supreme Court has defined "[a] 'deceptive act or practice' [as] a material representation, practice or omission likely to mislead a reasonable consumer."  *Davis v. McGuigan*, 325 S.W.3d 149, 162 (Tenn. 2010) (quoting *Ganzevoort v. Russell*, 949 S.W.2d 293, 299 (Tenn. 1997)).  So the TCPA, like the Act, is a species of fraud statute.

fails to present caselaw convincing us that the Tennessee Supreme Court would do so.  Lacking that authoritative signal, "we are loath to expand Tennessee's substantive law." *Strayhorn v. Wyeth Pharms., Inc.*, 737 F.3d 378, 405 (6th Cir. 2013).  Thus, we reject US Framing's invitation to adopt a reading of the statute that would permit recovery for derivative injuries.

In sum, US Framing has not plausibly alleged that it suffered any "economic damages directly resulting from" an alleged insurance-fraud violation.  Tenn. Code Ann. § 56-53-107(b)(1)(C).  And because US Framing has not plausibly alleged economic injury within the meaning of the statute, it cannot establish entitlement to treble damages under § 56-53-107(c).

B.

We turn now to whether US Framing has plausibly alleged that it may recover either attorney's fees and other legal expenses or a statutory penalty.  US Framing cannot recover either.

First, the statutory penalty.  An injured party may recover "[a] penalty of no less than one hundred dollars . . . and no greater than ten thousand dollars" for a criminal insurance-fraud violation.  Tenn. Code Ann. § 56-53-107(b)(1)(E).  US Framing's complaint did not specifically cite the statutory-penalty subsection of § 56-53-107, nor did US Framing use the word "penalty" anywhere.  Instead, US Framing alleged only "damages," without identifying any particular subsection of the Tennessee code.  R. 1-2, Compl., PageID 25.

Although we must reasonably construe the complaint in US Framing's favor, we cannot say that US Framing pleaded entitlement to the statutory penalty.  On appeal, US Framing attempts to frame the statutory penalty as "statutory damages," thus encompassing the penalty in its generalized claim for "damages."  Appellant Br. at 16.  The parties cite no Tennessee (or other) caselaw addressing whether the statutory penalty in § 56-53-107 qualifies as damages. But we predict that the Tennessee Supreme Court wouldn't view a pleading seeking damages as also seeking a statutory penalty in the context of § 56-53-107.

Once again, dictionaries help.  Black's Law Dictionary defines "damages" as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." *Damages*, Black's Law Dictionary (12th ed. 2024).  And Black's defines a "penalty" as "[p]unishment imposed on a wrongdoer, usu[ally] in the form of imprisonment or fine; esp[ecially] a sum of money exacted as punishment for either a wrong to the state or a civil wrong (*as distinguished from compensation for the injured party's loss*)." *Penalty*, Black's Law Dictionary (12th ed. 2024) (emphasis added).  Black's clearly draws a distinction between a penalty and damages, the latter generally being meant to compensate an injured party for his loss.  And although damages can sometimes be punitive in nature, Tennessee courts have recognized that damages, including punitive damages, are distinct from statutory penalties.  *See, e.g.*, *Fred Simmons Trucking, Inc. v. U.S. Fid. & Guar. Co.*, 2004 WL 2709262, at \*5 (Tenn. Ct. App. Nov. 29, 2004) (distinguishing between punitive damages and statutory penalties).  Indeed, § 56-53-107(b)(1) refers to both "damages" and "penalt[ies]," and "a material variation in terms suggests a variation in meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 25 (2012).

US Framing provides no reason to think that the Tennessee Supreme Court would interpret the term "penalty," as used in § 56-53-107, contrary to its plain meaning.  Because damages don't include a statutory penalty in this context, we conclude that US Framing failed to plead the statutory penalty as relief.

That leaves attorney's fees and other legal expenses.  The Act provides that an injured party may recover "[r]easonable attorneys' fees [and] related legal expenses, including internal legal expenses and court costs" for both civil and criminal violations.  Tenn. Code Ann. § 56-53-107(a)(1)(B), (b)(1)(B).  US Framing, in its complaint, asked the court to award it attorney's fees.  But under Tennessee law, attorney's fees (when recoverable at all) are available only to a prevailing party.  *See Eberbach v. Eberbach*, 535 S.W.3d 467, 477 (Tenn. 2017) (noting that where a statute authorizes the awarding of attorney's fees, the court should use "its discretion to determine whether an award to the prevailing party is appropriate"); *see also House v. Est. of Edmondson*, 245 S.W.3d 372, 377 (Tenn. 2008).  The Tennessee Supreme Court has held that a prevailing party is someone who "succeeds on a 'significant claim' which affords the [party] a substantial measure of the relief sought." *Daron v. Dep't of Corr.*, 44 S.W.3d 478, 481 (Tenn.

2001).  US Framing, as discussed above, has not plausibly alleged that Continental caused it any injury compensable under the Act.  So even if US Framing could establish that Continental violated either §§ 56-53-102 or 103 by defrauding its insurer, US Framing could not obtain "a substantial measure of the relief sought."  Thus, US Framing cannot recover attorney's fees or related legal expenses.

* * *

We AFFIRM.